IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GUILLERMO A. SALAZAR VELASQUEZ,

        Petitioner,

 vs.                                                       No. CIV 05-685 MCA/LFG

ALLEN COOPER, Warden of Cibola County
Correctional Center,

        Respondent.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

    1. This is a proceeding on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner Guillermo Alfonso Salazar Velasquez ("Salazar") challenges the execution of a federal sentence handed down by the United States District Court for the Central District of California. Salazar is currently incarcerated at the Cibola County Correctional Center in Milan, New Mexico. As Salazar is confined in this judicial district and is attacking the execution rather than the validity of his sentence, this Court has jurisdiction to hear his claims under 28 U.S.C. § 2241. Bradshaw v. Story, 86 F.3d 164, 166 (10th Cir. 1996); McIntosh v. United States Parole Comm'n, 115 F.3d 809, 811-12 (10th Cir. 1997).

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

Factual Background

2. Salazar filed his Petition [Doc. 1] and Memorandum in Support [Doc. 2] on June 17, 2005. The Government filed its Response [Doc. 5] on July 19, 2005. Petitioner filed a Traverse [Doc. 6] on August 1, 2005. The case is now ready for ruling. For the reasons given below, the Court recommends that the petition be denied and the case be dismissed with prejudice.

3. Salazar asserts in his Petition and Memorandum that he was arrested by federal authorities in 1988 on drug charges and was convicted following a jury trial and sentenced to serve a prison term of 20 years, plus 10 years' supervised release. Salazar states that he was housed in various federal facilities until 2001, when he was transferred to a private facility in Texas which operates under contract with the United States Bureau of Prisons ("BOP") and Department of Justice ("DOJ"). On June 6, 2001, he was transferred to Cibola County Correctional Center ("CCCC") in Milan, New Mexico, also a private facility operating under contract with BOP and DOJ, which houses only federal inmates serving federal sentences. [Doc. 2, at 2-3]. Respondent does not dispute these assertions, and the Court accepts them. [*See*, Doc. 5, at 2].

4. Salazar alleges that on March 24, 2005 at approximately 7:15 a.m., Correctional Officer ("C.O.") Romero ordered him to report to the Intake Room. Salazar says he asked Ms. Romero twice why he was needed at Intake, and twice she responded that she did not know why. When Salazar arrived at Intake, he discovered that he was there to give a urine sample. He says that the other inmates had been informed that they should not urinate before going to Intake, but he was not so informed and therefore "was forced to drink several cups of 'sink water' before he was ready" to give a sample. When he questioned Mr. Caldwell, the officer in charge of collecting the urine samples, the officer told him that Romero was supposed to have informed Salazar not to use the toilet

prior to going to intake. [Doc. 2, and Ex. A thereto].

     5. Later that day, Salazar filed a grievance against C.O. Romero. In the grievance, he stated:

> Ms. Romero has failed to follow orders or chooses to ignore them like always, this is not the first incident in our unit and other units with this CO. Ms. Romero is an overage, overweight, untrained and an unqualified CO that should not be working for any correctional faciliy [sic], least of all for a facility that has a contract with the BOP and the Department of Justice. The BOP does not accept applicants for a position of CO unless the applicant passes the aptitude test and has completed a special training and IS NOT older than 35 years of age. Ms. Romero is over 35 years of age and started working for the CCA when she was over that age limit, in another words, she can not work as a CO in a BOP facility or its contractors. Furthermore, Ms. Romero does not follows [sic] the rules, the orders given to her and the regulations, because she makes her own rules and does what she wants and does not care for the safety and security of the inmates. Since she is overage and overweight, she cannot respond in a timely manner in case of an emergency, thus jeopardizing the safety and security of the Federal inmates housed in this facility.
>     Ms. Romero should not be working in the units were [sic] the inmates are housed, by allowing her to work in the units the facility is putting in jeopardy the safety and the security of the Federal inmates.

[Doc. 2, Ex. A].

     6. Salazar states that on March 30, 2005, he was called to the Unit Secretary's Office, where Chris Lucero ("Lucero"), the facility investigator, was waiting for him. Salazar alleges that Lucero intimidated him and threatened to bring charges against him for filing the grievance. The next day, Lucero submitted an Incident Report in which he stated that Salazar complained that a female officer was "overage, overweight, untrained and unqualified" to be a correctional officer. Salazar was charged with "Insolence toward a staff member." [Doc. 2, Ex. B].

     7. Salazar prepared a written statement responding to the charge. In this statement, Salazar asked that the charge of insolence be vacated, as his complaints that C.O. Romero was "overage" and

"overweight" were factual statements and were not "directed at her personally or in a direct manner" and were not intended to be "insulting or degrading." Salazar said that if Lucero thought the words were meant to be insulting or degrading, "that is his problem." He claimed that Lucero's action in bringing a charge of insolence was meant as retaliation for Salazar's exercise of his right to freedom of expression, and for his use of the grievance process. [Doc. 2 and Exs. B and C thereto].

8. The Unit Disciplinary Committee ("UDC") held a hearing on April 1, 2005. The Committee found that Salazar was indeed guilty of insolence. As a sanction, he was moved to a different unit and was given 20 hours of extra duty. [Doc. 2 and Ex. B thereto]. Salazar, being dissatisfied with this result, filed an appeal on April 5, 2005. In the appeal, Salazar complained that he was being punished and intimidated for using the grievance procedure and for exercising his right to freedom of expression. He also argued that the staff members who conducted the UDC hearing were "not fully qualified to hold the positions of Unit Manager and Case Manager," as they did not have the requisite educational background, and the proceedings should therefore be ruled null and void. Salazar requested that the insolence charge be quashed and that Lucero be sanctioned for abusing his authority and retaliating against him. [Doc. 2, Ex. D].

9. The appeal was officially denied on April 19, 2005. On April 14, 2005, Salazar received a memorandum from Respondent, Warden Allen Cooper ("Cooper"), explaining the reasons for the denial. In the memorandum, Cooper rejected Salazar's explanation that he did not mean any disrespect toward C.O. Romero but was merely stating the facts as to her age, weight and qualifications. Cooper wrote:

> I have reviewed the original complaint, included in this packet, and determined that any reasonable person, reading the document would determine that the references of "overage" and "overweight" were

4

>made with malicious intent.  The very tone of the complaint and the added reference to her qualifications and training reinforced the perception that you were referring to her inappropriately.  Because of this fact, I am denying your appeal for Insolence Toward a Staff member (code 312).

[Doc. 2, Ex. D].

    10.  Cooper went on in the memorandum to explain that CCCC is owned and operated by Corrections Corporation of America ("CCA"), and that the facility follows the hiring guidelines of CCA unless the contract with BOP states otherwise.  Cooper informed Salazar that a copy of CCCC's contract with BOP was located in the prison library and he invited Salazar to read it at his leisure.  He noted that the contract includes a provision to the effect that the BOP concurs with the hiring practices of CCA, and therefore the facility is not required to follow federal weight and age requirements.  He stated further that C.O. Romero was determined to be fully qualified to perform her duties at CCCC, as were the two officers who conducted the UDC hearing.  Cooper also told Salazar that C.O. Romero was correct in not telling him why he was directed to report to Intake on the morning of March 24, 2005.  [Id.].

    11.  Cooper further informed Salazar that Lucero acted correctly in bringing the insolence charges.  Cooper wrote that Lucero:

>thoroughly investigated the complaint in complete fairness.  During the course of the investigation, he noted the insolence and disrespectful tone in your complaint and took the appropriate action.  You, and every other inmate incarcerated at his facility, is encouraged to report anything you believe is a violation of established policy.  In such cases, staff will investigate and take appropriate action.  However, submitting a complaint does not entitle you to use insults as a means of reinforcing your discontent.  I see no indication that the Investigator [*i.e.*, Lucero] retaliated against you for utilizing the Administrative process.

[Id.]. In concluding the April 14 memorandum, Cooper told Salazar that the insolence report would remain as written, and that the sanction against him would be upheld.

12. On April 23, 2005, Salazar filed a "Regional Administrative Remedy Appeal" with the Bureau of Prisons, Privatization Management Branch. [Doc. 2, Ex. E]. The appeal was rejected on May 16, 2005, on grounds that "this issue is not appealable to the BOP. You must use the grievance procedures at your facility." [Id.]. Salazar did not appeal this ruling nor did he pursue the matter in any further administrative proceeding. He filed his federal habeas petition in federal court on June 17, 2005.

## Discussion

13. As grounds for his § 2241 petition, Salazar alleges: (1) Lucero violated his First Amendment rights, retaliated against him for using the grievance procedure, and prevented him from accessing the Administrative Remedy process; (2) his Due Process rights were violated in that the staff who conducted the UDC hearing were not fully qualified to hold the positions of Unit Manager and Case Manager; (3) CCCC does not follow federal requirements in hiring correctional officers, thus jeopardizing the safety and security of federal inmates; and (4) the BOP staff that oversees and administers contract facilities housing federal inmates failed to oversee the disciplinary process at CCCC and thus violated Salazar's Due Process rights. [Doc. 2].

14. The Government counters that the overall tone and spirit of Salazar's comments were insolent and were not protected speech. It further argues that Salazar has been accorded full Due Process rights, and that none of his constitutional rights have been infringed. [Doc. 5].

### *Allegations Involving Investigator Lucero*

15. Salazar alleges that after he filed his grievance against C.O. Romero, the facility's

investigator, Lucero, immediately called him, "harassed, threatened and intimidated" him, and later retaliated against him by charging him with insolence for the language used in the grievance. Salazar contends that, in so doing, Lucero violated his First Amendment right to freedom of expression. He further alleges that Lucero denied him access to the Administrative Remedy process and to the courts. For these reasons, he asserts, the disciplinary sanction was unjustified and should be reversed.

     16. It is undisputed that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 2259 (1987). However, in analyzing whether an inmate's First Amendment right to freedom of speech has been violated,

> [w]e start with the familiar proposition that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate polices and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law. [Internal punctuation and citations omitted].

Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974). Although a court cannot abdicate its constitutional responsibility to protect fundamental liberties such as freedom of speech, it should ordinarily defer to the professional expertise of corrections officials who must, in the first instance, determine whether a regulation limiting inmates' method of communication furthers the institutional objectives of the prison system. The court should override that judgment only where there is "substantial evidence in the record to indicate that the officials have exaggerated their response" to

7

considerations of security.  Pell, 417 U.S. at 827.

     17.  A prisoner's freedom of expression may legitimately be restricted only if the limitations are "reasonably related to legitimate penological interests."  Thornburgh v. Abbott, 490 U.S. 401, 404, 109 S. Ct. 1874, 1877 (1989).  In determining whether a prison regulation is "reasonably related to legitimate penological interests," the court must examine:  (1) whether there is a valid, rational connection between the prison regulation and the legitimate and neutral governmental interest put forward to justify it; (2)  whether there are alternative means that remain open to prisoners for exercising their rights; (3) the impact that accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally; and (4) whether there exists an "obvious, easy alternative" to restricting the inmate's constitutional rights, the absence of which is evidence of the reasonableness of the regulation.  Turner v. Safley, *supra*, 482 U.S. at 89-90.

     18.  Although Turner v. Safley applies to prison rules and regulations, its principles are also applicable to other prison actions, such as a transfer or disciplinary proceedings.  Frazier v. DuBois, 922 F.2d 560, 562 (10th Cir. 1991).  In conducting the analysis under Turner, the court is to accord "substantial deference" to the prison authorities.  Id.

     19.  With regard to the first factor, the Court finds there is a rational connection between maintenance of order in the prison and the rule sanctioning a prisoner's insolent language toward guards. A prison regulation forbidding inmates from engaging in disrespectful behavior toward prison employees, and from using vulgar, abusive, insolent or improper language toward employees was upheld by the Seventh Circuit in Ustrak v. Fairman, 781 F.2d 573 (7th Cir. 1986).  In upholding dismissal of one count of the inmate-plaintiff's complaint challenging a sanction he received for writing a letter in which he described prison officers in colorful and highly derogatory terms, the

circuit court noted:

> We can imagine few things more inimical to prison discipline than allowing prisoners to abuse guards and each other. The level of violence in American prisons makes it imperative that the authorities take effective steps to prevent provocation . . . . People who want to enjoy the full panoply of constitutional rights to express themselves had best refrain from committing crimes punishable by imprisonment.

Ustrak v. Fairman, *supra*, at 580.

20. As for the second factor, the Court finds that Salazar had "alternative means" of exercising his right to state a complaint against a corrections officer. His specific grievance concerned the fact that the corrections officer did not inform him that he was being called to give a urine sample and, as a result, he was forced to drink several cups of "sink water" in order to prepare for the sample. Salazar parlayed this minor complaint into a general attack on the corrections officer, whom he described as "overweight," "overage" and "underqualified." Even if these charges were true, her age and weight have nothing to do with the manner in which she handled the urine sample incident. Warden Cooper explained to Salazar that the officer's handling of the matter was in keeping with prison rules, and it stands to reason that lack of notice of an upcoming urine sample might well prevent attempts to make a switch or otherwise produce an unreliable result. The "alternative means" at Salazar's disposal for making a complaint regarding the correctional officer's attitude toward him would have been to file a grievance describing the incident and supporting his assertion that she behaved in an unprofessional manner, while leaving out the derogatory language referring to her weight and age. The Court cannot say that prison officials were unreasonable in finding this language offensive and insolent.

21. Salazar asserts that he was simply pointing out a violation of hiring regulations, in an

effort to protect his fellow inmates from the safety and security risks resulting from overage, overweight, unqualified corrections officers. Assuming this is a valid basis for filing a grievance, again Salazar could have done so in an inoffensive manner, without maligning the dignity of the corrections officer. He had an "alternative means" of registering his complaint and offering his suggestions for improvement.

22. The third consideration cited by the Court in Turner v. Safley is whether accommodation of the constitutional right might have a "ripple effect," impacting fellow inmates or prison staff. As noted above, accommodation of the right to freedom of expression in the prison setting necessarily entails some restrictions on the content and manner of speech or writing, in the interests of prison security. The Court can discern no positive benefit to allowing inmates to use disrespectful and insolent language toward prison guards or other employees, any more than a benefit would ensue from permitting guards to use offensive language toward inmates or other prison employees.

23. Finally, there is no "obvious, easy alternative" which would permit Salazar to use offensive language toward corrections officers. His First Amendment right to criticize authority, even to be offensive or abusive toward persons in positions of power, was necessarily limited when he entered the prison environment. The Court finds that Lucero did not violate Salazar's freedom of speech in that Salazar has no right, in the prison context, to use offensive language toward a corrections officer. Although Salazar's language is rather tame (*compare* the language of the inmate's letter in Frazier, in which he referred to prison officers as "stupid lazy assholes"), the Court defers to the finding by prison authorities that Salazar's tone was "insolent" and subject to sanctions, a finding which is supported by the record.

24. Salazar also complains that Lucero's actions were taken in retaliation for the exercise of

his constitutional right to express himself. While prison officials may not retaliate against an inmate for filing administrative grievances or exercising his constitutional rights, Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991), the prison authorities in this case had a legitimate reason for sanctioning Salazar based on the language he used in his grievance. Had Salazar been sanctioned for filing a grievance, without using offensive language but simply describing and complaining of C.O. Romero's conduct in connection with the urine sample incident, such sanction would not pass constitutional scrutiny. That is not what happened in this case.

25. Finally, Salazar contends that Lucero denied him access to the Administrative Remedy process and access to the courts. A prison official who retaliates against an inmate because of the inmate's legitimate use of the grievance process violates the prisoner's constitutional right to petition for redress of grievances and right of access to the courts. Hale v. Scott, 252 F. Supp. 2d 728, 732 (C.D. Ill. 2003), *citing* DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000).

26. In the present case, however, prison authorities found that Salazar used the grievance process for the illegitimate purpose of attempting to humiliate and disrespect a corrections officer. The record indicates that prison officials considered Salazar's complaint against C.O. Romero and responded to the substance of his grievance. He was given a hearing on the proposed sanction for insolence and was allowed a full opportunity to appeal the adverse ruling. When his appeal was denied, the warden wrote Salazar a two-page memorandum explaining the reasons for the ruling. There is nothing on the record to indicate that Salazar's due process rights were curtailed, nor that Lucero's action in ordering a disciplinary sanction against him was unjustified or motivated by a desire to retaliate against Salazar for exercising his rights.

### *Qualifications of Staff Conducting UDC Hearing*

27. Salazar next contends that the two staff members who conducted his UDC hearing, Unit Manager Ms. Judd and Case Manager Ms. Jaramillo, were not "fully qualified" to hold their positions, and therefore the proceeding was null and void. Salazar argues that, under BOP and CCA regulations, a Case Manager is required to be a college graduate with a degree in social or behavioral science. He argues from this that a Unit Manager must necessarily meet those requirements as well, since the Unit Manager is a higher-ranking position. Salazar attaches as Exhibit G to his Memorandum in Support a job description for "Case Manager" listing qualifications as: "Graduate from an accredited college or university with a degree in social or behavioral science or a closely related field with work experience that includes directly providing case management services or training for same preferred. A valid driver's license is required." There is no indication on Exhibit G as to the source of this job description.

28. Salazar also contends that the hearing as conducted violated his due process rights, because when he presented his written statement at the hearing [*see* Doc. 2, Ex. C], he was told it was "too late," as he had already been found guilty of the charge of insolence.

29. In his April 14, 2005 memorandum to Salazar, Warden Cooper stated that CCCC follows the guidelines of CCA, the private company which operates the facility, in establishing qualifications for hiring, unless the facility's contract with BOP provides otherwise. Cooper stated further that, by terms of its contract for operation of CCCC, BOP concurred with CCA's hiring practices and therefore "we are not required to follow federal weight and age requirements" and:

> [t]he same applies to your comments regarding the qualifications of the Unit Manager and Case Manager who presided over your hearing. These employees do not require Bachelors degrees, however, each

12

>person possesses more than sufficient experience in the field of Corrections to perform their duties to standard. Because they meet the requirements of these positions, they are fully qualified to render a decision in your hearing.

[Doc. 2, Ex. D].

30. Neither party supplied the Court with a copy of the BOP-CCA contract. Salazar does not deny that the contract reads as described by Warden Cooper in his memorandum; rather, he argues that the BOP violated his constitutional rights by allowing CCA to establish its own standards for employee qualification and violated its own regulations which require that the "written job descriptions should be reviewed to determine if they accurately describe the current duties being performed by the respective employee and if the people in those positions meet minimum qualifications as outlined in the job descriptions." [Doc. 6, Ex. 4].

31. Respondent argues that BOP may permit a different standard for its contract facilities. It appears that in this case, the Bureau intentionally adopted CCA company standards for CCCC. Salazar has not presented the Court with anything that contradicts these assumptions, and the Court agrees with Respondent's argument that, as long as the staff members were qualified by CCA standards, and those standards were accepted by BOP, the employees were therefore qualified to sit on the UDC panel which heard Salazar's case.

32. Salazar has failed to demonstrate that he has a constitutional right to dictate the qualifications of prison employees. There is no constitutional violation in BOP exercising its professional judgment that a particular contractor's hiring policies, even if they differ from hiring policies at other institutions operated by BOP, are adequate for the contractor to perform its duties under the contract and to provide for inmate safety and security. The Court agrees with

Respondent's argument that BOP's granting CCA permission to use its own hiring standards "simply permits the Bureau of Prisons a wider latitude in managing its custodial responsibilities for prisoners across the nation, and it cannot be said its decision to permit greater local control is inappropriate or jeopardizes any prisoners' rights." [Doc. 5, at 9-10].

33. Salazar alleges further that the UDC committee members violated his due process rights at the hearing by reaching a decision before allowing him to present his written statement challenging the sanctions imposed as a result of the insolence charge. [Salazar's written statement is attached as Ex. C to Doc. 2]. However, in his appeal from the UDC Committee's decision, Salazar wrote that he was called to the Unit Manager's office for a hearing at about 8:40 a.m. on March 31, 2005; that he presented his Response-Defense in writing (the Statement at issue); that he was allowed to present his case orally and "[a]fter I presented my written report, Ms. Judd [the Unit Manager who was conducting the hearing] read it, and I was found guilty of the charge and as punishment, I was moved to a different unit and was given 20 hours of extra duty." [Doc. 2, Ex. D].          34. Salazar filed an appeal of this decision on April 4, 2005, a few days after the hearing. In the appeal, he made no complaint to the effect that he was not allowed to present his written statement. In fact, he stated just the opposite, as quoted above. In addition, the Incident Report on which the sanctions were based, which is dated April 1, 2005, includes the following notation in the section labeled, "Comments of Inmate to Committee Regarding Above Incident": "I/M Salazar stated that the C/O failed to follow orders & the C/O who collected the urine was C/O Caldwell. I/M Salazar provided the attached statement for the UDC *which was read during UDC proceeding*. [Emphasis added]." [Doc. 2, Ex. B].

35. Salazar's assertion, made for the first time in his petition, that he was not allowed to

14

present his written statement and that the matter was prejudged before the hearing began, is belied by the record, including his own words, written shortly after the incident. Salazar cannot create a sham issue of fact by making assertions that contradict his own earlier statements on the record. Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986). The Court finds no due process violation in the conduct of the UDC hearing.

*Federal Hiring Requirements*

36. Salazar next contends that his constitutional rights were violated in that CCCC does not conform to BOP standards in its hiring practices, even though the inmate population there consists entirely of federal prisoners. Salazar alleges that "30 to 40 percent of the Staff of this Facility" are overweight and overage [Doc. 2, at 13]; at another point he states, "this facility has about 35% or more of the COs that are over the age of 45 years, and also has a great number of COs that are over the weight limit." [Doc. 6, at 3].

37. As noted above, Warden Cooper sent Salazar a memorandum explaining the reasons for denying the appeal and for rejecting Salazar's complaints regarding hiring standards at CCCC. In this memo, Cooper informed Salazar that CCCC follows the hiring guidelines established by CCA and is not required to follow federal weight and age requirements in hiring correctional officers, unless the contract with BOP states otherwise.

38. In the preceding section, the Court discussed this issue, concluding that there is no constitutional violation in BOP's concurring with and authorizing CCA's hiring standards, even if those standards differ in part from BOP's own regulations. For the same reasons, the Court rejects Salazar's claim under this cause of action.

*Oversight by BOP of Disciplinary Process at CCCC*

39. Finally, Salazar argues that BOP has a duty to oversee and administer CCCC, as it is a privately owned and operated prison facility under contract with BOP and DOJ. He contends that BOP should have retained ultimate authority over his disciplinary hearing rather than allowing "private officials" to conduct the hearing. BOP's failure to have its own employees conduct the hearing, or at least to oversee the process, he argues, violated his constitutional right to due process. BOP further violated his constitutional rights, he claims, when it rejected his Administrative Remedy Appeal on grounds the issue raised was "not appealable" through the BOP.

40. There is nothing unconstitutional about housing inmates in a prison operated by a private contractor. *See*, Montez v. McKinna, 208 F.3d 862 (10th Cir. 2000); Rael v. Williams, 223 F.3d 1153 (10th Cir. 2000). The operation of a prison includes performing disciplinary functions, and there is no due process violation in the delegation of this function by BOP to CCA under their contract, so long as BOP retains the final decision-making authority. Gallo v. Pugh, No. CV 305-062, 2005 WL 2237614 (S.D. Ga. July 21, 2005).

41. BOP retains ultimate oversight of the disciplinary process in a privately-operated prison housing federal inmates. 28 C.F.R. § 542.10 (2004) *et seq.* As Salazar acknowledges, an aggrieved inmate may appeal a disciplinary sanction to the BOP. The constitution does not require that BOP employees conduct every disciplinary hearing that occurs in privately-run prisons with which BOP contracts. The decision to allow CCA employees to conduct such hearings clearly falls within the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Meachum v. Fano, 427 U.S. 215, 225, 96 S. Ct. 2532, 2538 (1976). Salazar's preference that UDC hearings be run by BOP employees does not rise

16

to the level of a constitutional claim.

      42. Salazar argues also that BOP violated his due process rights by rejecting his appeal. As noted above, Salazar submitted a Regional Administrative Remedy Appeal on April 23, 2005 to the Federal Bureau of Prisons. It was received by BOP Privatization Branch on May 2 or 3, 2005. [Doc. 2, Ex. E]. On May 4, 2005, the Administrative Remedy Coordinator responded to Salazar's appeal with a Rejection Notice which stated, "This issue is not appealable to the BOP. You must use the grievance procedures at your facility." [Id.].

      43. It is unclear what the BOP meant by this response. It may be that BOP determined that the issues Salazar was raising did not fall within the area considered to be "BOP matters," as outlined in the memorandum dated May 26, 2004 and which Salazar included as part of Doc. 2, Ex. D. That memorandum refers to the Inmate Handbook, which neither party has made part of the record. It is clear, however, that Salazar could have pursued the appeal process further but failed to do so.

      44. BOP's Administrative Remedy Program, set forth at 28 C.F.R. § 542.10 *et seq.,* applies to inmates in institutions operated by BOP, or those inmates housed in contract prisons under BOP responsibility. 28 C.F.R. § 542.10(b). Pursuant to this regulation, the persons responsible for implementation of the Administrative Remedy Program are the Community Corrections Manager, Warden, Regional Director, and General Counsel. These persons are required to work together to establish procedures for investigating and responding to inmate grievances. Id., at § 542.11(a). An inmate who is not satisfied with the Warden's response to his grievance may submit an appeal to the appropriate Regional Director within 20 days of the Warden's decision. If he is not satisfied with the Regional Director's response, he may submit an appeal to the General Counsel within 30 days of the Regional Director's decision. Id., at § 542.15(a).

45. If a submission is rejected, the inmate shall be provided with written notice explaining the reason for the rejection. If the defect is correctable, the notice shall inform the inmate of this fact and allow him time to correct the defect and resubmit the appeal. If the inmate is not given an opportunity to correct the defect, as apparently happened in Salazar's case, the inmate may appeal the rejection to the next appeal level. Id., at § 542.17. At this point, "[t]he Coordinator at that level may affirm the rejection, may direct that the submission be accepted at the lower level (either upon the inmate's resubmission or direct return to that lower level), or may accept the submission for filing." Id., at § 542.17(c).

46. Salazar never availed himself of the remedy afforded by Section 542.17(c). It is possible that the notation regarding Salazar's issues being "not appealable to the BOP" was an error; if so, and if he had appealed the rejection, BOP would have been able to correct the error by considering his appeal, or perhaps BOP could have directed that Salazar's submission be considered again at a lower level. Salazar could have obtained a fuller explanation of the reasons for the rejection if he had pursued the appeal process available to him. Instead, he chose to bring his complaint to court and argue that he was denied due process because the BOP rejected his appeal. The Court rejects this argument.

47. While the Court could dismiss Salazar's case for failure to exhaust his administrative remedies, the better course is to dismiss the claim with prejudice. Salazar is attempting to parlay his annoyance at having to drink "sink water" for a urine sample into a federal constitutional case. The Court finds his claims to be without merit. Salazar fails to demonstrate that any actions by Respondent violated his constitutional rights. He is therefore not entitled to relief under 28 U.S.C. § 2241.

**Recommended Disposition**

That the petition under 28 U.S.C. § 2241 be denied and the case dismissed with prejudice.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge